RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0209p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CHRISTOPHER SAMPLE,

           *Plaintiff-Appellee,*

    *v.*

JASON BAILEY,

           *Defendant-Appellant,*

No. 04-4174

> Appeal from the United States District Court
> for the Northern District of Ohio at Cleveland.
> No. 04-00344—David D. Dowd, Jr., District Judge.

Argued: April 20, 2005

Decided and Filed: May 9, 2005

Before: NELSON and MOORE, Circuit Judges; RESTANI, Judge.[*]

---

### COUNSEL

**ARGUED:** Patricia Ambrose Rubright, CITY OF AKRON DEPARTMENT OF LAW, Akron, Ohio, for Appellant. David C. Sheldon, JOHN BROOKS CAMERON & ASSOCIATES, Medina, Ohio, for Appellee. **ON BRIEF:** Patricia Ambrose Rubright, Bruce H. Christensen, Jr., CITY OF AKRON DEPARTMENT OF LAW, Akron, Ohio, for Appellant. David C. Sheldon, JOHN BROOKS CAMERON & ASSOCIATES, Medina, Ohio, Craig T. Weintraub, Beachwood, Ohio, for Appellee.

---

### OPINION

---

    KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant, Officer Jason Bailey ("Bailey"), appeals from the district court's denial of his motion for summary judgment on the ground that he is entitled to qualified immunity with respect to Plaintiff-Appellee Christopher Sample's Fourth Amendment claim of excessive force. The court held that summary judgment was inappropriate because Christopher Sample ("Sample") alleged a violation of a clearly established constitutional right and there was a genuine factual dispute regarding whether Bailey's actions were objectively reasonable in light of that right. On appeal, Bailey argues that the constitutional right

---

[*] The Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

at issue is not clearly established within the factual context of this case and therefore, he should be entitled to qualified immunity. For the reasons set forth below, we **AFFIRM** the district court's denial of Bailey's motion for summary judgment.

## I. BACKGROUND

The following facts are undisputed. At approximately 9:20 p.m. on January 15, 2003, an alarm company alerted the Akron Police Department dispatch center that a rear motion detector had been activated at B & G Designs International ("B & G"), a commercial business located on Kenmore Boulevard in Akron, Ohio. After being notified by the dispatcher, Officer Bailey and his partner, Officer Shawn Prexta ("Prexta"), responded to the alarm. Upon arrival at B & G, the officers checked that the front door was locked, and then proceeded to the rear of the building. Because it was night, the officers used flashlights to guide their way. Once they had arrived at the back of the building, Prexta noticed that a window on the second floor was broken. Prexta also found footprints in the snow on top of a dumpster, located below the broken window. In the back of B & G, there was a small staircase leading to a second floor door with a small window. Bailey climbed the stairs to the door. Looking through the window into the building, Bailey could see a white male carrying computer equipment. Because he thought the person rightfully belonged there, Bailey tapped on the window with his flashlight to get the man's attention. When the man noticed Bailey's tapping, "he turned around and took off." Joint Appendix ("J.A.") at 103 (Bailey Dep. at 72). Bailey then realized the person was a burglar. Sample admitted in his deposition that he was the person Bailey saw and that he took off because he had an outstanding misdemeanor warrant for his arrest.

After Sample ran, Bailey descended the stairs and informed Prexta that a suspect was in the building. Prexta called additional units for assistance and returned to the front of B & G, where he discovered that Officer Mobley ("Mobley") had arrived. Mobley secured the front of the building while Prexta returned to the back with Bailey. At approximately the same time, William Huber ("Huber"), the key holder for B & G, arrived on the scene. Huber informed Bailey that no one was supposed to be inside the building. Police Sergeant Christopher Brewer ("Brewer") also arrived on the scene and took control of the situation. After securing the area outside, Brewer directed Huber to open the rear entrance of the first floor of the building so that Bailey and Prexta could secure the immediate area inside. Once they had done so, Huber entered the building to deactivate the alarm, which had been continuing to sound. After that, Brewer directed Bailey and Prexta to search the building.

Bailey and Prexta began searching the first floor. Each officer had his firearm in one hand and a flashlight in the other. The interior lights of the building were not on, so the flashlights were the only source of light. As the officers searched, they repeatedly announced that they were members of the Akron police and requested that the suspect show himself. After securing the entire first floor, the officers ascended the stairs to the second floor of B & G. On the second floor, there was a large room which was cluttered with machines and other equipment. The officers noticed a long table towards the back of the room with a large white sign leaning against it. Because the sign blocked any view of what was behind the table, the officers carefully approached the table from either side. As Bailey walked by a black cabinet near the end of the table, he smelled a foul odor, including what smelled like alcohol. Prexta smelled it as well. Recalling an earlier experience, Bailey suspected that Sample might be hiding in the black cabinet.

The black cabinet had two doors which opened from the center and was approximately five feet wide, two feet deep and two and a half feet high. The front of the cabinet was approximately three feet from the end of the table. Without informing Prexta, Bailey opened the left cabinet door with his left hand, while his right hand held his gun. Bailey was careful to open the door from the left side so as not to stand directly in front of the open cabinet. When the cabinet door was opened,

Sample was revealed hiding inside. Sample was crouched inside the cabinet with his back towards the left wall and his legs curled up tight towards his chest. Both of his hands were clearly visible on the ground near the opening of the cabinet. Upon discovering Sample, Bailey directed his firearm and flashlight towards Sample and ordered him to make sure his hands were visible at all times and to come out of the cabinet. The precise sequence of events after this point is disputed among the parties.

## A.  The Police Officers' Version

Bailey claims that after he ordered Sample out of the cabinet, Sample did not say anything or immediately respond. Unbeknownst to Bailey, Prexta had approached the cabinet from the right side of the table and crouched down on his knees. When he was within two feet of the cabinet, Prexta holstered his weapon and tried to effect an arrest. Prexta claims he did so because he believed that Bailey was covering him and that Sample no longer posed a danger to the officers. Prexta stated in his deposition that he attempted to grab Sample's left arm to pull him out of the cabinet and handcuff him, but that Sample pulled away, rolled his body, and attempted to pull his left arm underneath himself. Bailey stated in his deposition that he was aware that Prexta was somewhere to his right but did not see Prexta either holster his weapon or grab Sample's left hand. Bailey did see Sample roll his body towards the inside of the cabinet and move his right hand up towards his torso. Bailey stated that Sample's actions concerned him, and he shouted "Show me your hands" several times. J.A. at 120 (Bailey Dep. at 89). Bailey claims that Sample did not heed his commands, but instead Sample reached inside his jacket with his right hand.[1] According to Bailey, "[a]t that point, that's when [he] feared for [his] life" and he instinctively fired his gun at Sample. J.A. at 121 (Bailey Dep. at 90). Prexta stated in his deposition that he never saw Sample reach inside his jacket. Prexta was crouched near the cabinet when the shots were fired and quickly retreated towards the staircase when the gunfire began because he had holstered his weapon.

In all, Bailey fired his weapon seven times at Sample, hitting him in several places on his body. Bailey stated in his deposition that he did not realize the number of times he fired his gun. He claims that the sound of the shots echoed in the room giving him the impression that Sample was firing back. As he was firing his gun, Bailey was moving away from the cabinet down the side of the table. Bailey stated that he stopped firing when Sample and the cabinet were out of his sight line. Once he stopped firing, he stated that he rounded the table to check on Sample and Prexta, who by then was on the staircase calling for an ambulance. According to Bailey, Sample was sitting in the cabinet and said to him, "I don't even have a gun." J.A. at 132 (Bailey Dep. at 106). Bailey claims that at that point Sample fell partially out of the cabinet and Bailey saw blood coming from the wounds. In his deposition, Bailey stated that he continually asked Sample why he reached into his jacket, to which Sample responded he wanted a cigarette. Bailey claims that Sample continued to reach into his pocket while he lay on the floor bleeding, and that Bailey kept knocking Sample's hand away from his jacket.

Sergeant Brewer, who was outside at the time of the incident, heard the shots and ran up the stairs to the second floor. He stated in his affidavit that Sample kept pulling his hands up to his body despite the fact that Bailey was ordering him otherwise. Brewer reached into the cabinet and dragged Sample out onto the floor. Sample was not immediately searched because of the blood. Brewer stated that "[i]t was a constant struggle to keep him from putting his hands in his coat. He kept saying how hot he was and wanted his coat off." J.A. at 187 (Brewer Aff. at 2). Mike Fagan ("Fagan"), an Akron firefighter-paramedic, arrived on the scene. Fagan stated in his affidavit that

---

[1]Sample was dressed entirely in black. Though Sample stated in his deposition he was wearing a black sweatshirt, J.A. at 160 (Sample Dep. at 54), the police officer who tagged the clothing as evidence stated that he tagged a black velour lightweight jacket with pockets on the left side and the right side cut off. J.A. at 181 (Dorsey Aff.).

Sample was attempting to place his hand inside his jacket pocket as well. Using rubber gloves, Fagan searched Sample and did not find anything in his jacket pockets.

## B. Sample's Version

Sample stated in his deposition that on the night of January 15, 2003, he had consumed a beer and a half at a bar and some more alcohol later at his home. After the shooting, his blood serum alcohol level was revealed to be 0.185%, well above the legal limit for driving in Ohio. Sample claims that he went to B & G that night to help a friend, John, retrieve keys thrown into the building by John's girlfriend.[2] According to Sample, both John and his girlfriend went with him to B & G. Sample claims that he and John pushed the dumpster towards the window in the rear of B & G and that Sample lifted John into the window. John then reached down and pulled Sample into the building. Sample stated that after John had found his keys, they were returning to the window when they saw the flashlights of the police outside. According to Sample, after seeing the police, the two parted company and Sample hid in the black cabinet.

In his deposition, Sample stated that from inside the cabinet he could hear Bailey and Prexta talking. According to Sample, eventually the cabinet door opened and an officer told him to "[c]ome out with your hands out." J.A. at 161 (Sample Dep. at 60). At that point, Sample stated that he moved his leg out in an attempt to exit the cabinet. He claims that his legs were outside of the cabinet, while his torso and arms were still inside. According to Sample, the officer again instructed him to put his hands in the air, which he did. Sample stated that when he reached out with his right hand to grab the edge of the top of the cabinet to pull himself out, he was shot several times. He stated that his right "hand [came] from down to out, that's when [Bailey] started firing." J.A. at 163 (Sample Dep. at 65). He claims that he never reached inside his jacket.

Sample's recollections of the events which occurred after he was shot are understandably sketchy. He stated at his deposition that he remembers someone saying "Stop it, he's down." J.A. at 164 (Sample Dep. at 69). His next recollection is of an older officer standing over him reassuring him that an ambulance was on the way. He does not recall speaking to any of the officers at the scene or later at the hospital. In his affidavit, Akron Police Detective Bill Laughlin ("Laughlin") stated that he spoke to Sample at the hospital after the shooting. In his investigation report, he stated that Sample claimed he was at the B & G with John to retrieve John's keys. Laughlin claims that Sample admitted that he was reaching for his cigarettes when he was shot. He also quotes Sample as saying "I'm going to sue, man. He shot me and I was just grabbing for my cigarettes. The guy didn't tell me not to stop or nothing." J.A. at 188 (Laughlin Aff.).

On February 4, 2003, Sample pleaded guilty to breaking and entering, Ohio Rev. Code Ann. § 2911.13(A), and possessing criminal tools, Ohio Rev. Code Ann. § 2923.24(A), as a result of his presence at B & G that night. The state trial court sentenced Sample to six months in prison for the crimes. He was released on July 21, 2003.

## II. PROCEDURAL HISTORY

On January 15, 2004, Sample brought suit against Bailey, Police Chief Michael Matulavich, and the City of Akron in the Court of Common Pleas in Summit County, Ohio. The complaint alleged various state-law claims as well as a violation of Sample's Fourth Amendment right to be free from the use of excessive force to effect a seizure. Pursuant to 28 U.S.C. § 1441(b), the defendants removed the case to the United States District Court for the Northern District of Ohio.

---

[2]Sample did not provide the last names of either John or his girlfriend, and neither were found when the police searched the building.

After limited discovery, Bailey moved for summary judgment claiming he is entitled to qualified immunity with respect to the shooting of Sample.

On August 24, 2004, the district court denied Bailey's motion for summary judgment on the ground of qualified immunity. The court found that when the facts were taken in the light most favorable to Sample, he had alleged a violation of a clearly established constitutional right. Moreover, the court held that there was a genuine factual dispute related to whether Bailey's actions violated that clearly established right. Accordingly, the court denied the summary judgment motion. Bailey filed this interlocutory appeal shortly thereafter.

## III. ANALYSIS

### A. Jurisdiction

As a threshold matter, we must first determine whether we have jurisdiction to consider Bailey's interlocutory appeal. In *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), the United States Supreme Court held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." In these cases, "the appealable issue is purely a legal one: whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law." *Id.* at 528 n.9. By contrast, in *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995), the Court held that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." The Court noted that "an interlocutory appeal concerning this kind of issue in a sense makes unwise use of appellate courts' time, by forcing them to decide in the context of a less developed record, an issue very similar to one they may well decide anyway later, on a record that will permit a better decision." *Id.* at 317. Therefore, put clearly, "[a] denial of qualified immunity on purely legal grounds is immediately appealable. A denial of qualified immunity that turns on evidentiary issues is not." *Turner v. Scott*, 119 F.3d 425, 427 (6th Cir. 1997) (internal citation omitted).

In this case, the district court denied Bailey's motion for summary judgment because of a factual dispute between the parties. Specifically, there is a dispute about where Sample's right hand was at the time that Bailey fired his weapon. Sample stated that he was reaching out to grab the edge of the top of the cabinet to pull himself out, while Bailey claims that Sample put his hand in his jacket pocket. The district court concluded that the factual dispute was critical in determining whether Bailey's use of deadly force violated Sample's clearly established constitutional right.

On appeal however, Bailey does not raise the issue of the location of Sample's hand, but instead argues that even under Sample's version of the facts, he is entitled to qualified immunity. Therefore, the issue before this court is a "neat abstract issue of law," *id.* at 428, whether the facts as alleged by Sample demonstrate a violation of a clearly established constitutional right. Accordingly, we have jurisdiction pursuant to 28 U.S.C. § 1291 over Bailey's appeal of the district court's denial of summary judgment based on qualified immunity.

### B. Denial of Qualified Immunity

Sample brought suit against Bailey pursuant to 42 U.S.C. § 1983, which "by its terms does not create any substantive rights but rather merely provides remedies for deprivations of rights established elsewhere." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (internal quotation omitted). To prevail on his § 1983 claim, Sample "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). The Supreme Court has held, however, that "government officials performing discretionary functions generally

are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity "is an affirmative defense that must be pleaded by a defendant official." *Id.* at 815. "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow*, 457 U.S. at 806).

"Because review of a denial of qualified immunity is an issue of law, our review is *de novo*." *Yates v. City of Cleveland*, 941 F.2d 444, 446 (6th Cir. 1991). In reviewing a claim for qualified immunity, we employ a three-step inquiry:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff[] show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (internal quotation omitted).[3] "Qualified immunity must be granted if the plaintiff cannot establish each of these elements." *Radvansky*, 395 F.3d at 302.

### 1. Constitutional Violation

The first step in the qualified immunity analysis is to determine whether based on the facts as alleged by Sample, a constitutional violation has occurred. "*[A]ll* claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop,

---

[3]One panel of this court has recently suggested that our three-step approach for evaluating qualified immunity claims outlined in *Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003), is inconsistent with the Supreme Court's two-step inquiry outlined in *Saucier v. Katz*, 533 U.S. 194 (2001). *Dunigan v. Noble*, 390 F.3d 486, 491 n.6 (6th Cir. 2004). We disagree and take a brief moment to explain our reasoning.

The Supreme Court in *Saucier* stated that when reviewing claims of qualified immunity, the initial inquiry must be "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. If a constitutional violation has been established, the Court stated that "the next, sequential step is to ask whether the right was clearly established." *Id.* These two inquiries form the preliminary two steps in the *Feathers* approach.

If we find the first two requirements have been met, the final inquiry is "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers*, 319 F.3d at 848. This final requirement directly flows from the Court's recognition that "[t]he qualified immunity inquiry . . . has a further dimension." *Saucier*, 533 U.S. at 205. Specifically, the Court noted that "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* "Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the 'objective legal reasonableness' of the action, assessed in light of legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal citation omitted). Thus, the Court explained that "even if a court were to hold that [an] officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Saucier*, 533 U.S. at 206. In *Saucier*, the Court reaffirmed the principle laid out in *Anderson*, and stated that "[i]f the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." *Id.* at 205; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (noting that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law").

Thus, we conclude that the *Feathers* three-step approach correctly encompasses the Supreme Court's approach to qualified immunity claims and serves to ensure government officials the proper protection from civil suit under the law.

or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Twenty years ago, in *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), the United States Supreme Court held that the Fourth Amendment prohibits a police officer's use of deadly force to seize an unarmed, non-dangerous suspect. The Court stated that the use of deadly force is only constitutionally reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* In evaluating an excessive force claim, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

In applying these principles, we have stated that "only in rare instances may an officer seize a suspect by use of deadly force." *Whitlow v. City of Louisville*, No. 00-6557, 2002 WL 1455317, at *5 (6th Cir. Jul. 1, 2002). We have upheld the use of deadly force by a police officer when the factual situation revealed a perceived serious threat of physical harm to the officer or others in the area from the perspective of a reasonable officer. *See Boyd v. Baeppler*, 215 F.3d 594, 604 (6th Cir. 2000) (upholding qualified immunity for police officers who used deadly force against a suspect who had a gun in his hand and who pointed it at officers and others); *Bell v. City of East Cleveland*, No. 96-3801, 1997 WL 640116, at *3 (6th Cir. Oct. 14, 1997) (upholding qualified immunity for a police officer who shot and killed a boy who pointed a toy gun at the officer); *Rhodes v. McDannel*, 945 F.2d 117, 120 (6th Cir. 1991) (upholding qualified immunity for police officer who shot and killed a homeowner who approached police officers with a raised machete in his hand and ignored repeated warnings to drop the weapon), *cert. denied*, 502 U.S. 1032 (1992).

By contrast, in this case, under the facts alleged by Sample, Bailey was not faced with a serious threat of physical harm to himself or his partner which would necessitate the use of deadly force. After Bailey ordered Sample to exit the cabinet, Sample stated that he moved his right hand "from down to out" to grab onto the edge of the top of the cabinet. J.A. at 163 (Sample Dep. at 65). Nothing about the movement of Sample's right arm would be threatening to a reasonable officer. Sample was attempting to comply with Bailey's command to exit the cabinet. His hand was at all times visible and, according to Sample, never entered into his jacket pocket. Bailey argues in his brief that the movement must be considered in light of the overall context of the incident, including: the dark commercial building, the triggering of the alarm, the smell of alcohol, Sample's non-responsiveness. Appellant's Br. at 21-22. We agree that the action must be viewed in light of the surrounding circumstances, but even within this context, Bailey was not justified in using deadly force. Sample was found in a cabinet. His movement was therefore limited and he could not quickly charge the officers. He was not verbally threatening, but rather merely silent. His hands were visible and empty. He was ordered by the police to exit the cabinet, and therefore some movement was to be expected. Prexta, the other officer on the scene, stated in his deposition that he had holstered his weapon at this point because he did not believe that Sample posed a threat to him or Bailey. Without considering Bailey's claim that Sample placed his hand in his pocket, we conclude that Sample's mere action of moving his arm to grab the top of the cabinet would not cause a reasonable officer to perceive a serious threat of physical harm to himself or others. Therefore, Bailey's use of deadly force to seize Sample was constitutionally impermissible, when we view the facts in a light favorable to Sample, as we must.

## 2.  Clearly Established Right

Having established that there was a constitutional violation, we turn to the second step of the qualified immunity analysis — whether the constitutional right at issue was clearly established.  "If the law at that time was not clearly established, an official could not . . . fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818.  The constitutional right cannot simply be a general prohibition, but rather "the right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The Court noted that "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal citation omitted).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  "In inquiring whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993).

In denying qualified immunity, the district court held that since the *Garner* decision in 1985, it has been clearly established that the use of deadly force is only constitutionally reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11.  Bailey argues in his brief that this generalized statement is not particular enough to put a reasonable officer on notice in the specific factual context of this case.  Instead, Bailey argues that the absence of a factually similar precedent case requires this court to find that the constitutional right is not clearly established.  Put another way, Bailey claims that a reasonable officer would be unaware that he could not use deadly force to seize a burglary suspect, who was unarmed but found hiding in a building at night.  We disagree.

In *Brosseau v. Haugen*, 125 S. Ct. 596, 599 (2004), the United States Supreme Court recently stated that "*Graham* and *Garner*, following the lead of the Fourth Amendment's text, are cast at a high level of generality" and therefore may be insufficient to give a police officer fair warning of the constitutional parameters regarding the use of deadly force in a specific factual context.  In *Brosseau*, the police officer was faced with the situation of "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at 600.  The Court cited three cases, including one from this court, which reached different conclusions on whether a police officer in such a situation would be justified in using deadly force.  As a result, the Court held that a reasonable officer who fully understood *Garner*'s general constitutional command nevertheless would not know whether the use of deadly force was permissible in that situation.  Because a reasonable officer at that time would not have had fair warning that his conduct violated the Fourth Amendment, the Court held that the law was not clearly established and therefore, the officer was entitled to qualified immunity. *Id.*

By contrast, the Court recognized that "in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law." *Id.* at 599.  As the Supreme Court has noted, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  When a general constitutional principle "is not tied to particularized facts," the principle "can clearly establish law applicable in the future to different sets of detailed facts." *Harris v. Coweta County*, _ F.3d _, No. 03-15094, 2005 WL 901889, at *8 (11th Cir. Apr. 20, 2005) (internal quotation omitted).  The determinative issue is whether the officer had "fair warning that his conduct deprived [the plaintiff] of a constitutional right." *Hope*, 536 U.S. at 740 (internal quotation omitted). *See, e.g., Harris*, 2005

WL 901889, at *9 (holding that it was an obvious case that a police officer may not ram his cruiser into a suspect's vehicle during a high speed chase where the suspect did not pose an immediate threat of harm to the police officers or others); *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) (holding that it was an obvious case that a police officer may not fire a shotgun at a suspect wrestling with a victim while the victim was holding the suspect's gun over his head and pointing it upward).

We hold that this case is "an obvious case" because it does not present a novel factual circumstance such that a police officer would be unaware of the constitutional parameters of his actions. We have held that it has been clearly established in this circuit for the last twenty years that a criminal suspect "ha[s] a right not to be shot unless he [is] perceived to pose a threat to the pursuing officers or to others during flight." *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988). This articulation of the *Garner* rule is clearly established even in situations with diverse factual distinctions. *See*, *e.g., Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) (holding that it is clearly established that an officer could not use deadly force to effectuate an arrest of an intoxicated suspect at night in an unfamiliar place without a reasonable belief that the suspect posed a significant danger to the officer or others); *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996) (noting that an officer may not use deadly force to seize a suspect walking towards the police in an enclosed unfamiliar area at night with his hands at his side); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1045 (6th Cir. 1992) (holding that the law was clearly established that the police could not shoot a paranoid schizophrenic suspect, who was armed with knives but had already been shot several times). Though a factually similar precedent case may not have existed at the time these cases were decided, we held that the rule established in *Robinson* was particular enough to give a reasonable officer fair notice of his unconstitutional conduct. Thus, regardless of whether the incident took place at day or night, in a building or outside, whether the suspect is fleeing or found, armed or unarmed, intoxicated or sober, mentally unbalanced or sane, it is clearly established that a reasonable police officer may not shoot the suspect unless the suspect poses a perceived threat of serious physical harm to the officer or others. These factual distinctions between the cases do not alter the certainty about the law itself. Similarly, we conclude that the factual context of this case — the darkness, the unfamiliar building, Sample's intoxication and unresponsiveness — is sufficiently similar to our body of case law applying the *Robinson* rule so as to give Bailey fair warning that shooting a suspect who was not perceived as posing a serious threat to the officers or to others is unconstitutional.

In support of his argument, Bailey cites our opinion in *Robinette v. Barnes*, 854 F.2d 909, 914 (6th Cir. 1988), in which we stated in dicta that when a police officer was searching for a burglary suspect hiding in an unfamiliar area at night, the officer "was justified in using whatever force was necessary, even deadly force, to protect himself and the other officers and to apprehend the suspect." The *Robinette* dicta cannot be read as an open invitation for law enforcement to shoot any burglary suspect hiding in an enclosed, unfamiliar area at night regardless of the threat posed to the officers. *See id.* (suggesting that officers use trained police dogs to apprehend such suspects because they do not have "the risks attendant [with] the use of firearms in the darkness, thus, frequently enhancing the safety of the officers, bystanders and the suspect"). Instead, the language in *Robinette* linked the use of deadly force directly to the safety of the officers. *See id.* (explaining that "this is a case where an officer was forced to explore an enclosed unfamiliar area in which he knew a man was hiding"). Our dicta in *Robinette* recognized the inherent dangers facing police officers searching for a suspect who is hiding from them. In such a situation, officers have an unquestionable right to protect themselves from a possible ambush. Once a suspect has been found, however, and the police have weapons directed at him, as in this case, the inherent danger to the officers resulting from a hidden suspect in an enclosed, unfamiliar area at night is diminished. *See Dickerson*, 101 F.3d at 1163 (holding that a suspect walking towards the police in an unfamiliar area at night with his hands at his side does not justify the use of deadly force). No reasonable police officer would think that once the suspect has been found, it is still constitutionally permissible to shoot the suspect absent a serious threat to the officers or others. Indeed, once Bailey had both his

gun and flashlight trained on Sample, there is no factual distinction between this case and any other one in which the police officers confront a suspect to effect an arrest. Therefore, there is nothing about the factual context of this case which would justify a reasonable officer in believing that the well-established *Robinson* rule did not apply. Thus, we conclude that the contours of the constitutional right were sufficiently clear in this situation so that a reasonable officer would have known that Sample had a right not be shot unless he was perceived as a threat to the officers or to others.

### 3. Objectively Unreasonable

The final step of the qualified immunity analysis is "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right[]." *Feathers*, 319 F.3d at 848. In the excessive force context, the Supreme Court explained that "[a]n officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205. In this case, we conclude that Bailey's mistake was not reasonable.

Similar to our discussion above, we conclude that under the facts as alleged by Sample, it was objectively unreasonable for Bailey to order Sample to remove himself from the cabinet and then to perceive Sample's movement of his right arm outward as a threat that necessitated the use of deadly force. Sample was simply attempting to comply with Bailey's command to exit the cabinet. His hand was at all times visible and, according to Sample, never entered into his jacket pocket. Therefore, we hold that Sample has offered sufficient evidence to demonstrate that Bailey acted objectively unreasonably.

### IV. CONCLUSION

In conclusion, we hold that under the facts alleged by Sample in this case, Bailey is not entitled to qualified immunity as a matter of law. Therefore, the district court's denial of Bailey's motion for summary judgment is hereby **AFFIRMED**.