**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0290n.06
Filed: May 23, 2008

**No. 06-4371**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **ROBERT KEITH ABEL**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| **VAN A. HARP, ET AL.**, | ) | **O P I N I O N** |
| | ) | |
| *Defendants* | ) | |
| | ) | |
| **PHILIP J. TORSNEY; RICHARD A. WREN;** | ) | |
| **JAMES L. LARKIN;** | | |
| | | |
| *Defendants - Appellants* | | |

BEFORE:    COLE and GRIFFIN, Circuit Judges; and FORESTER, District Judge.[*]

   **R. GUY COLE, JR., Circuit Judge.**  Defendants-Appellants, Phillip J. Torsney,

Richard A. Wrenn, and James L. Larkin, three FBI Special Agents, appeal the district court's

denial of their motion for summary judgment on the grounds of qualified immunity in this civil

rights action filed under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403

U.S. 388 (1971).  Plaintiff-Appellee Robert Keith Abel, a pro se federal prisoner, brought suit in

district court claiming that his Fourth Amendment rights were violated by Defendants' use of

---

   [*]The Honorable Karl S. Forester, Senior United States District Judge for the Eastern
District of Kentucky, sitting by designation.

excessive force during his arrest for bank robbery.  Defendants sought summary judgment on the grounds of qualified immunity.  The district court denied their motion, finding that there were genuine issues of material fact.  Defendants now present an interlocutory appeal, arguing that they should be shielded from suit on the basis of qualified immunity.  For the following reasons, we **AFFIRM** the district court's denial of summary judgment.

## I.

### A. Factual Background

The confrontation giving rise to this *Bivens* action began between 9:30 and 10:00 a.m. on the morning of September 7, 2000.  Plaintiff arrived at First Federal Savings and Loan Bank in North Olmsted, Ohio and handed the teller a brown bag with a note stating, "I Have a Gun and Extra <u>Ammo And Will Use It</u>!  Place <u>All</u> Your <u>$100.00, $50.00, $20.00, and $10.00</u> Bills In The Bag <u>No Die Packs</u> & <u>Or I'll Shoot</u>."  (JA 142 (emphasis in original).)  Upon receiving this threat, the teller placed several bills into the bag and gave it to Plaintiff.  Plaintiff then fled the scene.  One of the managers at the bank identified Plaintiff driving away in a stolen Subaru vehicle and reported the license plate information to the North Olmsted Police Department.  Defendants, who were then members of the Violent Crimes/Major Offender Squad of the Cleveland FBI Office (also referred to as the "Bank Robbery Squad"), were dispatched in response to the call and joined with local law enforcement officers in searching the surrounding area for Plaintiff.  On this day, Defendants were dressed in plain clothes: Wrenn wore a shirt, tie, dress pants, and dress shoes, while  Larkin and Torsney were dressed in jeans and t-shirts.

After departing the bank, Plaintiff abandoned the car when he drove into a ditch near the

Westlake Recreation Center in an attempt to evade a marked police car. He then fled by foot into The Estates, a residential subdivision adjacent to the Westlake Recreation Center. Once in The Estates, Plaintiff crawled under the deck of a house located in the subdivision, where he remained for several hours and from where he observed police searching the area.

While the parties agree on the foregoing facts, their accounts of subsequent events differ markedly. According to Defendants, they decided to make an additional sweep of The Estates, although the local officers had discontinued their search after being unable to locate Plaintiff. At this time, an FBI Supervising Agent called upon Larkin to return to the Westlake Recreation Center and conduct a search of the premises from his vehicle. Torsney and Wrenn continued their search on foot and walked through several yards on Regency Circle, a street within The Estates, until Torsney spotted a pair of tennis shoes under the deck of the house at 29236 Regency Circle. Torsney then radioed to Larkin to meet him at that address.

Torsney observed Plaintiff furtively attempting to slide out from beneath the deck and escape. In response, Torsney claims that he drew his weapon and yelled several times, "FBI, stop right there" and "Don't move." Torsney also instructed Plaintiff to make his hands visible, to which Plaintiff responded, "I gotta go," and continued to exit the deck. Torsney then placed his weapon back in his holster to free his hands in preparation for any physical altercation with Plaintiff that might arise. Thereafter, Torsney pinned Plaintiff on the ground and placed him in a headlock to prevent him from fleeing. In his affidavit, Torsney insists that Plaintiff resisted the immobilization efforts and tried to flee.

Because of Plaintiff's resistance, both Larkin and Wrenn approached Torsney and

assisted him in subduing Plaintiff. Larkin believed their physical tactics were not succeeding, and so he struck Plaintiff in the nose with his knee in an attempt to neutralize Plaintiff's resistance. Within a minute or so, Defendants managed to handcuff and restrain Plaintiff. Later that day, Plaintiff was taken to a local hospital, where he was diagnosed with a fractured facial bone, facial and scalp contusions, and a fractured nose. About two weeks later, Plaintiff received surgery for these injuries.

According to Plaintiff's account of the events, the altercation took place under drastically different circumstances. In his affidavit, Plaintiff states that at approximately 1:15 p.m., from his hiding place under the deck, he observed what he thought were surveyors or fence company employees measuring the yards in the subdivision and placing wooden stakes into the ground to demarcate property lines. After the surveyors left, Plaintiff claims that he observed a man, whom he believed to be the property owner of the deck under which he was hiding.

Fearing that the homeowner would see him and call the police in response, Plaintiff attempted to exit the space beneath the deck. As he was sliding his body out from under the deck, Plaintiff maintains that he heard somebody scream, "hey." When he turned his back to identify the source of the shout, he saw one of the surveyors approaching him. Plaintiff later identified the surveyor as Torsney but insisted that, at the time, Torsney was wearing plain clothes—a pullover shirt and boots—and never identified himself as an FBI agent. Plaintiff further avers that Torsney never drew his gun but instead kicked Plaintiff in the back of his head and neck multiple times, while Plaintiff was still on the ground. During the second kick, Plaintiff caught Torsney's boot, causing Torsney to fall backwards and generating enough momentum to

pull Plaintiff out two-thirds of the way from under the deck. Torsney then began punching Plaintiff in the face, head, and upper shoulder area repeatedly, as well as kicking Plaintiff with his free foot.

Two other "surveyors" approached Torsney and Plaintiff, but neither of them identified themselves as FBI agents or displayed any badges, weapons, or other indications of their affiliation with the FBI. According to Plaintiff's affidavit, together, the three officers used their hands, feet, and an unidentified blunt steel object to deliver blows to his face, head, neck, back, and groin. Plaintiff maintains that his goal throughout this altercation was "to prevent what [he] thought were 'vigilante' surveyors, who had probably been told a 'bank robber' was somewhere in the area, from killing [him]." (JA 146.) Plaintiff further alleges that "each and every time [he] attempted to cover [his] face and head, the Defendants pulled [his] arms and hands back and kept delivering blow after blow to [his] head, while simultaneously kneeing and kicking [him] wherever they could get one in." (*Id*.) This conduct occurred for about two minutes, until Plaintiff saw a uniformed police officer approaching and believed the presence of the police would cause Defendants to cease their violence. Plaintiff then allowed the uniformed officer to handcuff him and place restraints on his ankles.

## B. Procedural History

Plaintiff filed a pro se complaint against then-active FBI Special Agent Torsney and then-retired FBI Special Agents Wrenn and Larkin, harnessing *Bivens* to charge Defendants with the use of excessive force under the Fourth Amendment in effecting his arrest on September 7, 2000. Defendants sought to dismiss the case on the grounds of insufficient service of process and lack

of personal jurisdiction.

Thereafter, Magistrate Judge Perelman issued a Report and Recommendation suggesting that the district court deny the motion to dismiss because Plaintiff's and Defendants' "diametrically opposed versions of the events of September 7, 2000 present genuine issues of material fact preclusive of granting [D]efendants the relief they seek." On the one hand, the Report and Recommendation reasoned, "[i]f the [P]laintiff was . . . the victim of an unprovoked brutal attack by the [D]efendants while he neither attempted to flee nor to resist arrest it could be found that the Fourth Amendment's prohibition against the use of excessive force in the course of a seizure had been violated." On the other hand, "if, as the [D]efendants allege, the [P]laintiff's injuries were sustained by him while they were attempting to subdue him as he attempted to resist arrest/flee it could be found that no constitutional violation occurred."

On September 8, 2006, the district court issued a memorandum opinion and order adopting the Report and Recommendation in full. In issuing its opinion, the district court made no reference to the issue of qualified immunity but instead focused on the need for the fact-finder to resolve which version of the events was credible. Accordingly, the court denied Defendants' motion for summary judgment, permitted the discovery process to proceed until November 3, 2006, and set a preliminary date for a trial on the merits. Defendants timely appealed on October 6, 2006. Plaintiff filed a motion to dismiss Defendants' appeal on jurisdictional grounds, but, on April 18, 2007, we denied the motion and allowed the appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

Jurisdiction was proper in the district court pursuant to 28 U.S.C. § 1331, because the claims Abel raised in his complaint present federal questions under *Bivens*. With respect to this Court, although "[a] denial of summary judgment is generally not a final judgment" subject to appeal under 28 U.S.C. § 1291, it "may be appealed as [a] collateral order[] where (1) the defendant is a public official asserting the defense of qualified immunity, and (2) the issue appealed concerns not which facts the parties might be able to prove but whether certain alleged facts reflect a violation of clearly established law." *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002); *see also Johnson v. Jones*, 515 U.S. 304, 311 (1995).

It is important to note, however, that this exception for interlocutory review of denials of summary judgment on the grounds of qualified immunity is narrow. Such an appeal is only permissible if the appeal rests not on a factual dispute but on "neat abstract issues of law." *Johnson*, 515 U.S. at 317 (citations omitted); *see also Farm Labor Org. Comm., et al. v. Ohio State Highway Patrol, et al.*, 308 F.3d 523, 531 (6th Cir. 2002) (quoting *Mattox v. City of Forest Park*, 183 F.3d 515, 519 (6th Cir. 1999)). Accordingly, a defendant must essentially "concede the most favorable view of the facts to the plaintiff for purposes of the appeal," *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998), and must limit his argument to questions of law premised on facts taken in the light most favorable to the plaintiff.

On appeal, Defendants contest many aspects of Plaintiff's characterization of the facts. Considering the scope of interlocutory review, we lack jurisdiction to consider those arguments. We may, however, properly entertain jurisdiction over the purely legal issues Defendants raise. In assessing Defendants' legal arguments, we apply a de novo standard of review. *Meals v. City*

*of Memphis*, 493 F.3d 720, 728 (6th Cir. 2007). When a defendant invokes qualified immunity, it is the plaintiff who bears the burden of proof to demonstrate that the defendant is not entitled to summary judgment. *Davenport v. Causey*, --- F.3d ----, 2008 WL 899017, at \*5 (6th Cir. 2008). Notwithstanding this burden of proof, courts still construe a motion for summary judgment by viewing the facts in a light most favorable to the plaintiff, who represents the non-moving party. *Davenport*, 2008 WL 899017 at \*5; Fed. R. Civ. P. 56(c).

## III. DISCUSSION

The sole issue before us is whether Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment claim that Defendants employed excessive force in undertaking his apprehension and arrest. Plaintiff asserts that Defendants' failure to accede to the facts as construed in the light the most favorable to him divests us of interlocutory jurisdiction. Plaintiff also argues that if we choose to entertain Defendants' appeal, Defendants are nevertheless not entitled to qualified immunity because they failed to raise the doctrine as an affirmative defense in their motion to dismiss and thereby waived it. With respect to the merits, Plaintiff insists that Defendants are not entitled to qualified immunity because they clearly violated his Fourth Amendment rights during his seizure and arrest on September 7, 2000. While we reject Plaintiff's arguments regarding jurisdiction and waiver, we find Plaintiff's analysis of the merits of the qualified-immunity inquiry persuasive.

1.     Propriety of Interlocutory Appellate Review

As a threshold matter, Plaintiff disputes our jurisdiction to conduct an interlocutory

review of Defendants' appeal. In raising this jurisdictional argument, Plaintiff relies on *Phelps v.*

*Coy*, which explained that

> [i]f . . . the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal, otherwise, we cannot entertain the defendant's arguments, no matter how meritorious they may be.

286 F.3d 205, 298 (6th Cir. 2002) (quoting *Berryman*, 150 F.3d at 563) (internal citations

omitted).

Plaintiff is correct in pointing out that Defendants' brief on appeal is replete with

alternative characterizations of the facts; however, Plaintiff's interpretation of *Phelps* is

unpersuasive. After setting forth the standard for appeals of denials of summary judgment on

grounds of qualified immunity, the *Phelps* Court went on to explain that "[w]here . . . the legal

issues are discrete from the factual disputes, we may [nevertheless] exercise our jurisdiction to

resolve the legal issues only." *Id*. Thus, although Defendants dispute Abel's version of the facts,

they still request us to address "a series of strictly legal questions[,]" namely, whether Plaintiff's

rights were so clearly established during the altercation that a reasonable officer would have

known what standard governed his conduct, and whether Defendants' actions were objectively

unreasonable in light of that standard. Accordingly, we may properly exercise jurisdiction over

Defendants' interlocutory appeal, notwithstanding Defendants' dispute of the facts.

2. _____ Waiver

Plaintiff insists that Defendants waived the issue of qualified immunity by failing to raise

it in their initial motion to dismiss. In this motion, Defendants claimed that the district court

lacked personal jurisdiction over them because Plaintiff had not correctly effectuated service of process. The district court accordingly dismissed the claims against Defendants based upon insufficient service of process—a decision we subsequently reversed. *Abel v. Harp*, 122 F. App'x 248, 251 (6th Cir. 2005). Following remand to the district court, Defendants raised the issue of qualified immunity both in their answer and memorandum in support of their motion for summary judgment.

Plaintiff is correct that qualified "immunity must be affirmatively pleaded, [so] it follows that failure to do so can work a waiver of the defense." *English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir. 1994) (quoting *Kennedy v. City of Cleveland*, 797 F.2d 297, 300 (6th Cir. 1986)). However, the *English* Court also held that "[a]lthough . . . a defendant may challenge the sufficiency of a complaint on the basis of qualified immunity before filing a formal affirmative defense in his answer . . . requiring that it must be raised in a pre-answer motion is, we believe, unjustified and contrary to the orderly application of the rule." 23 F.3d at 1090. Therefore, Defendants' omission of qualified immunity in their pre-answer motion to dismiss, in and of itself, does not constitute a waiver of the defense.

3.      Qualified Immunity and Excessive Force

Turning to the merits of the instant appeal, the central question is whether, taking the facts in the light most favorable to Plaintiff, Defendants are entitled to protect themselves from suit by invoking qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity entails "*immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original).

To determine whether a defendant is entitled to the shield of qualified immunity, we have adopted a three-step inquiry: "(1) whether the facts taken in the light most favorable to plaintiff could establish a constitutional violation; (2) whether the right was 'a clearly established' right of which any reasonable officer could have known; and (3) whether the official's actions were objectively unreasonable in light of that clearly established right." *Risbridger v. Connelly*, 275 F.3d 565, 559 (6th Cir. 2002).[1] If the analysis under the first step suggests that no constitutional violation transpired, then the analysis is complete, and we should grant summary judgment to the defendant. *Davenport*, 2008 WL 899017 at *5.

In the instant case, the analysis is complicated by the fact that the district court failed to address directly the issue of qualified immunity. In adopting in full the Report and Recommendation issued by the magistrate judge, the district court found that Plaintiff's and Defendants' "diametrically opposed versions of the events of September 7, 2000 present genuine issues of material fact preclusive of granting [D]efendants the relief they seek." The district court's analysis indicates that nowhere did it expressly consider the issue of qualified immunity,

---

[1]The Supreme Court announced a two-pronged inquiry for evaluating claims of qualified immunity in *Saucier v. Katz*, 533 U.S. 194 (2001). However, we explained in *Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005), that our "three-step approach correctly encompasses the Supreme Court's approach to qualified immunity claims and serves to ensure government officials the proper protection from civil suit under the law."

despite instruction from the Supreme Court that qualified immunity is a "threshold question[.]"

*Saucier*, 533 U.S. at 197.  Given the district court's omission, we must canvas the record

ourselves to determine whether Plaintiff's facts, as necessarily admitted by Defendants, show a

violation of clearly established law.  *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en

banc) (holding that the proper inquiry is only whether plaintiffs' facts, as admitted by the

defendants, show a violation of clearly established law, not on which facts the parties may be able

to prove).

 a. Did Plaintiff assert a Constitutional Violation?

"[C]laims that law enforcement officers have used excessive force–deadly or not–in the

course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under

the Fourth Amendment and its 'reasonableness' standard." *Jones v. City of Cincinnati*, --- F.3d ---

-, 2008 WL 899030, at *3 (6th Cir. 2008) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

That is, we must evaluate the excessive-force claim at issue by assuming "the perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490

U.S. at 396.  "'Not every push or shove, even if it may later seem unnecessary in the peace of a

judge's chambers,'. . . violates the Fourth Amendment." *Id*. (quoting *Johnson v. Glick*, 481 F.2d

1028, 1033 (2d Cir. 1973)).  In making an assessment of reasonableness, we must take account of

the fact that "police officers are often forced to make split-second judgments—in circumstances

that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a

particular situation." *Id*.

 In applying the reasonableness calculus, we consider three factors: "(1) the severity of the

crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006) (quoting *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004)). Despite these three discrete factors, the jurisprudence on excessive-force claims has consistently maintained that "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . its proper application requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396.

In the instant case, we find that the second two factors militate against a finding of reasonableness on the part of Defendants under the facts as alleged by Plaintiff. Admittedly, the first element of the reasonableness calculus—the severity of the crime—works in Defendants' favor. Plaintiff himself admitted to robbing a bank and fleeing the scene in a stolen getaway vehicle. Armed bank robbery, classified as aggravated robbery under Ohio law, *see* Ohio Rev. Code § 2911.02, followed by flight from the premises is clearly a serious crime.

Notwithstanding the seriousness of Plaintiff's crime, Defendants' response in apprehending and arresting Plaintiff was neither proportionate nor reasonable. With respect to the second and third reasonableness factors—whether the suspect poses an immediate threat to the safety of the officers or others and whether Plaintiff actively resisted or attempted to evade arrest—Plaintiff's factual allegations suggest a negative answer. In his affidavit, Plaintiff stated that "at no point during the beating was I concentrating on or attempting to 'flee' or 'escape.'" Rather, "from the onset of Torsney's initial attack, [Plaintiff's] only goal at that point forward for

the next two or three minutes was to prevent . . . [Defendants] from killing [him]." Moreover, Plaintiff alleges that throughout the course of the altercation, he was "[b]alled up in a fetal position to protect [his] face, chest, and stomach." Accepting Plaintiff's version of the events, as we are bound to do, one must conclude that Plaintiff had submitted to Defendants' authority, was in a passive position, was focused on self-protection, and posed little immediate threat to Defendants' safety.

While Defendants emphasize that Plaintiff caught hold of Torsney's boot and caused Torsney to fall backward, Plaintiff only engaged in this conduct as a self-protective maneuver. According to Plaintiff's affidavit, as he was attempting to exit the space beneath the deck under which he was hiding, Torsney approached him and kicked him twice in the back of the head and neck. During the second kick, Plaintiff admits to grabbing Torsney's boot to prevent the impact. Although this action caused Torsney to fall backward, Plaintiff maintains that his purpose in grabbing Torsney's boot was rooted entirely in self-defense: to "prevent [Torsney] from kicking [him] in the head." Moreover, once Torsney fell backward, the other two Defendants entered the altercation and used their feet, hands, and an unidentified steel object to deliver repeated blows to Plaintiff's face, head, neck, back, and groin. Taken together, these facts indicate that Plaintiff was overwhelmingly passive and did not actively resist arrest for at least two minutes, during which the three FBI agents pummeled him. Although mindful of our duty to grant a "measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case," *Burchett*, 310 F.3d at 944, considering Plaintiff's passive demeanor, Defendants acted unreasonably in kicking and punching Plaintiff multiple times in the

head and neck.  Moreover, the severe injuries Plaintiff sustained, including a fractured facial bone, facial and scalp contusions, and a fractured nose, attest to the disproportionality of Defendants' conduct in comparison to Plaintiff's passivity.  Accordingly, we find that Plaintiff's allegations – if true – assert a viable constitutional violation.                         \

b. <u>     Was the Right Clearly Established?</u>

Once a court determines that "a [constitutional] violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201.  The Supreme Court has directed courts to carry out this inquiry "in light of the specific context of the case, not as a broad general proposition." *Id*.  In other words, "'the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right.'" *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  As part of this context-specific inquiry, a court must conclude "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*.  And, "[a]lthough it need not be the case that the very action in question has been previously held unlawful, . . . in the light of pre-existing law the unlawfulness must be apparent." *Id*. (citation omitted) (second alteration in original).

As a general matter, it is clearly established that a suspect possesses a  right to be free from the use of excessive force. *See Graham*, 490 U.S. at 399 (recognizing that the use of

excessive force violates a suspect's Fourth Amendment rights). Additionally, at a more particularized level, Defendants had reason to know that the conduct they engaged in while apprehending and arresting Plaintiff was unlawful.

Defendants rely on several readily distinguishable cases. For example, in *Bouggess v. Mattingly*, 482 F.3d 886, 891 (6th Cir. 2007), we explained that "resisting arrest by wrestling oneself free from officers and running away would justify use of some force to restrain the suspect." Likewise, in *Lyons v. City of Xenia*, 417 F.3d 565, 577 (6th Cir. 2000), we found it reasonable for an officer to tackle a suspect who resisted arrest. Similarly, the use of force in handcuffing and arresting a suspect has been found reasonable when the suspect admitted resisting arrest by "twist[ing] and turn[ing] some." *Burchett*, 310 F.3d at 944.

Unlike in *Bouggess*, *Lyons*, and *Burchett*, however, in the instant case, Plaintiff allegedly did not actively resist arrest but instead assumed a primarily passive position. Although Plaintiff resorted to grabbing Torsney's boot, he allegedly did so out of self-defense, while still on the ground, after Torsney attempted to kick him in the head two times. Given the allegation that Plaintiff did not resist arrest, Defendants were not justified in the level of force they exerted.

c.    Were Defendants' actions objectively reasonable in light of the Right?

Since Plaintiff is able to survive the first two steps of the qualified-immunity inquiry, at this juncture, we must determine"whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right[]." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). In excessive-force

cases, the Supreme Court has explained that "[a]n officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether the particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205.

Here, the facts as alleged by Plaintiff indicate no mistake on the part of Defendants. Rather, when administering repeated blows to Plaintiff's head and neck, Defendants were fully aware of Plaintiff's passivity and self-defense. Even if Defendants reasonably interpreted Plaintiff's grabbing of Torsney's boot as an escalation of violence, they responded with an unreasonable amount of force. In light of Defendants' alleged knowledge, we conclude that Defendants' actions were not objectively reasonable for purposes of the present motion for summary judgment.

## IV. CONCLUSION

For the preceding reasons, we **AFFIRM** the judgment of the district court.

**FORESTER, Karl S., Dissenting**

I agree with the well-written majority opinion on all points except the question relating to the reasonableness of the officers' actions under the Fourth Amendment. Because I believe that the officers acted reasonably under the circumstances and did not use excessive force, I would grant them qualified immunity in the present case.

I accept, as I must, Abel's story that he believed that the officers were surveyors or homeowners intent on doing him harm. However, the court must view the officers' actions from the viewpoint *of the officers*, not Abel, in determining whether the officers acted reasonably under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

Returning to the three factors enunciated by the majority, the majority states that the second and third factors militate against a finding of reasonableness, but it is my opinion that they require a finding that qualified immunity is appropriate. As to the second factor, there is no question that the suspect posed an immediate threat to the safety of the officers and others. The officers were searching for Abel in the first instance because he had just fled what was believed to be a potentially violent bank robbery. While no bloodshed had occurred, Abel had clearly implied that he was not only armed, but willing to use force against innocent bystanders. Therefore, Abel was believed to be armed and dangerous at the time of the search. A fleeing felon – considered armed and willing to use force – can only be considered an immediate threat to the safety of the officers

and of others. Further, he had chosen to escape to a residential neighborhood where he admitted that he had observed children playing nearby. The very presence of an armed and fleeing felon posed a serious threat to homeowners, residents, and children in the area. Focusing on the third factor, the majority does not discuss these facts, but I believe they require a finding that the second factor is in favor of the officers.

As to the third factor, even when viewed in a light most favorable to Abel, I believe the evidence indicates that Abel actively resisted arrest and that the force used by the officers in response was reasonable. Abel contends that the officers initially kicked him twice in the back of the head and neck. However, this was at the point when, as Abel himself admits, he had seen the officers and was trying to exit from underneath the porch because he believed they were civilians bent on apprehending or harming him. It was entirely reasonable for the officers, who had been pursuing this fleeing and armed felon for several hours, to conclude that Abel was attempting to continue his flight or escape at this moment and, thus, reasonable for them to attempt to stop him.

Then, as Abel also admits, during the initial seconds of the encounter Abel was able to bring an officer to the ground and thereafter admittedly tried to prevent the officers from subduing him. From Abel's perspective, all actions that followed were taken in self-defense, but observing the actions from the officers' perspective, as we must, it was entirely reasonable for them to have understood Abel's actions to be an attempt to escape or resist arrest. Abel admitted as much when he told the officers in an interview after the arrest that he believed the officers "did what they needed to do" to effect his arrest and that he had nobody to blame but himself for the injuries he sustained. The fact that Abel thought the officers were civilians and believed he was acting in self-

- 19 -

defense is irrelevant; it still appeared to the officers as though he was resisting arrest and attempting to continue his flight. Given the officers' view of the situation, I believe it was reasonable of them to move "quickly and aggressively to end the confrontation." *Lyons v. City of Xenia*, 417 F.3d 565, 578 (6th Cir. 2005).

In sum, I believe that all three factors to be considered in the reasonableness analysis require a finding that the officers acted reasonably in the present case, I would reverse the district court and find that the officers were entitled to qualified immunity in the present case.