RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0271P (6th Cir.)
File Name: 01a0271p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DANIEL DUDLEY,
        *Plaintiff-Appellant,*

        *v.*

ROBERT EDEN, Officially and
Individually,
        *Defendant-Appellee,*

THEODORE KROCZAK, et al.,
        *Defendants.*

No. 99-3738

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-00607—Ann Aldrich, District Judge.

Argued: September 14, 2000

Decided and Filed: August 16, 2001

Before: JONES, SILER, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Albert L. Purola, Mentor, Ohio, for Appellant.
John D. Sayre, NICOLA, GUDBRANSON & COOPER,
Cleveland, Ohio, for Appellee. **ON BRIEF:** Albert L.

1

Purola, Mentor, Ohio, for Appellant. John D. Sayre, Vincent A. Feudo, NICOLA, GUDBRANSON & COOPER, Cleveland, Ohio, for Appellee.

---

## OPINION

---

NATHANIEL R. JONES, Circuit Judge. In 1998, Daniel Dudley ("Dudley") brought a § 1983 civil rights action against police officer Robert Eden ("Officer Eden" or "Eden"), and other police officers, for using excessive force to arrest him. 42 U.S.C. § 1983. Dudley also asserted supplemental state law claims for assault, battery, and infliction of emotional distress. After discovery, plaintiff and defendants filed motions for summary judgment. The district court granted the defendants' summary judgment motion on Dudley's § 1983 claim and declined to exercise jurisdiction over the plaintiff's remaining state law claims. Dudley now appeals the district court's order granting summary judgment to Officer Eden; the other parties have been dismissed. J.A. at 100. For the reasons stated below, we **AFFIRM** the district court's judgment.

## I. FACTS

This case involves the reasonableness of a police officer's use of force under the Fourth Amendment. In fact-driven inquiries such as this one, we must give careful attention to the particular facts and circumstances of the case before reaching our conclusion. *See Graham v. Connor*, 490 U.S. 386, 396 (1989)(The proper application of the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case . . . ."). Accordingly, we have examined the rapidly unfolding events of this case with great care.

At approximately 4:30 p.m. on April 5, 1996, Dudley walked into the Eastlake, Ohio Bank One Branch and ordered bank teller Chris Palmer to give him money. After taking the

money from Palmer, Dudley drove a stolen green BMW to a lot behind Manny's Bar and waited for the police to arrive. Dudley's plan was to commit suicide by way of police intervention.

At approximately 4:34 p.m., Chris Palmer telephoned the Eastlake Police Department and informed them of the robbery. Palmer indicated that the perpetrator was a white male who had left the premises in a green BMW and driven to the lot behind Manny's Bar. He also told the police that the suspect had not displayed any weapons. J.A. at 86. The dispatcher broadcast this information and asked that all available officers respond to Manny's Bar. Officer Lewis heard the dispatch and proceeded to the lot behind Manny's Bar. When Lewis arrived he found Dudley sitting in his car. Lewis drew his gun and approached Dudley while ordering him out of the car, but Dudley refused to get out. Moments later, Officers Krozack and Angelo joined Lewis and surrounded Dudley's vehicle. Lewis and Krozack attempted to open the doors of Dudley's car, but they were locked. When Lewis reached into Dudley's car to unlock the door, Dudley sped away. The officers shot at Dudley's tires and managed to hit at least one tire.

Upon arriving at the scene, Officer Eden saw Officer Lewis beside Dudley's vehicle. Eden saw Dudley accelerate out of the back lot and heard shots being fired. He asserts that he did not see who was shooting or know why they were shooting. Dudley "flew out" of the lot and turned onto a four lane street. According to witnesses, Dudley appeared to be out of control. He swerved into oncoming traffic before he returned to the correct side of the road. Dudley says that when he pulled out into the street, he was obstructed by a car and that he drove over the double yellow line to get around that car.

Still in his police cruiser, Officer Eden pursued Dudley from the curb lane while Dudley proceeded toward Route 91 in the passing lane. Precisely what happened next is not entirely clear. Plaintiff Dudley contends that Eden cut him off

and that just after the cars came to a complete stop, Eden fired at him striking him three times. J.A. at 83. In contrast, Eden asserts that Dudley rammed his driver side door and that as they were slowing down he fired three rounds into Dudley's car.

Eden testified that he could not see Dudley's hands when he fired his gun. J.A. at 27. He also stated that he feared for his own safety because Dudley had rammed his car, and that he was afraid for the public because of the extreme emotion that Dudley had shown when he was trying to escape the officers' custody. J.A. at 25.

Shortly after the shooting, Officer Krozak and Officer Lewis arrived on foot. They searched Dudley and found the money that he had stolen from the bank; however, they did not find a weapon. The officers told the paramedics that based on the casing stuck on the outside of Dudley's coat, they believed that Dudley had been shot in the right arm. After being admitted to the hospital Dudley underwent surgery. Dudley was also detoxified, because blood testing revealed that he had a blood alcohol content of .30 when he was admitted. J.A. at 84.

In 1998, Daniel Dudley brought a Section 1983 action against Robert Eden and the other police officers. He claimed that Eden and the other officers violated his Fourth Amendment right against unreasonable seizure by using excessive force in order to arrest him. Dudley also asserted state law claims for assault, battery, and infliction of emotional distress against the officers. After discovery, the plaintiff and the defendants filed motions for summary judgment. The district court granted the defendants' motions for summary judgment on Dudley's § 1983 claim and refused to exercise jurisdiction over Dudley's remaining state law claims.

Dudley now appeals the district court's order granting summary judgment in favor of Officer Eden. His submissions to this Court do not challenge the district court's denial of his own motion for partial summary judgment, or the court's

conclude that Dudley posed a serious threat to himself and others.

In addition, it is clear that the collision between Dudley and Eden did not decrease the threat that Dudley posed. When the two cars collided, the front end of Dudley's car smashed into the driver's side door of Officer Eden's police cruiser. Although the cars slowed to a halt, there is no evidence that Officer Eden had Dudley under control. If Dudley had put his car into reverse, he could have continued his escape and Eden would have been powerless to stop him. It would have only taken a few seconds for Dudley to swerve back into oncoming traffic and hit an innocent motorist as he had almost done minutes before.

Furthermore, the position of the cars meant that if Dudley were armed he would have had a clear shot at Officer Eden, who was slightly in front of Dudley and ill-positioned to see the suspect. Although it is true that Dudley was not armed and had no intention of killing anyone except for himself, there is no way that Officer Eden could have known this. Given Officer Eden's precarious position and the uncertainty of this rapidly evolving situation, no jury could find that Officer Eden's fear and his use of force were unreasonable.

## IV. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's order granting summary judgment in favor of the defendant Robert Eden.

did not engage in any aggressive behavior that indicated that he posed a serious threat to the police officers or anyone else. Dudley points out that after robbing the bank he waited for the police in a nearby parking lot, hoping that they would help him commit suicide by killing him. Although Dudley admits that he did drive away from the police, he emphasizes that he did so at a low rate of speed. He also contends that the only reason he collided with Officer Eden's vehicle was because Officer Eden cut him off. Furthermore, Dudley argues that if he did pose a danger to others, this threat was eradicated when Eden ensured his capture by colliding with his car and slowing it down to the point where it was nearly stopped. Accordingly, Dudley concludes that a rational jury could find that Officer Eden acted unreasonably when Eden shot him. We disagree.

As noted above, the reasonableness of the police officer's actions must be viewed in light of the "tense, uncertain, and rapidly evolving" circumstances that the officer faces. *See Graham,* 490 U.S. at 396-97. In this case, there is no doubt that the events that Officer Eden faced unfolded very quickly.[1] When Officer Eden received a call from the police dispatcher he was told Dudley had just committed a bank robbery. Although the dispatcher reported that Dudley had not displayed any weapons while robbing the bank, Eden reasonably perceived a real possibility that, like many bank robbers, Dudley was armed. Officer Eden arrived at the scene and saw Officer Lewis standing by Dudley's vehicle in a parking lot. Moments later, Dudley accelerated out of the parking lot and shots were fired. Dudley swerved recklessly into oncoming rush hour traffic before returning to the correct side of the street and heading west towards Route 91. Given Dudley's bank robbery, his refusal to comply with the commands of armed policemen, his attempt to evade arrest, and his reckless driving, it was reasonable for Officer Eden to

---

[1] According to the police radio broadcast, less than four minutes elapsed from the time of the dispatch until the time Dudley was shot. J.A. at 83.

refusal to exercise jurisdiction over his state law claims. Accordingly, these issues are not before us for disposition. *See Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995) ("We consider issues not fully developed and argued to be waived.").

## II.  STANDARD OF REVIEW

This Court reviews the district court's summary judgment decision *de novo*. When reviewing the record, all inferences shall be drawn in the light most favorable to the nonmoving party. *See Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 245-46 (6th Cir. 1997). However, an opponent of a motion for summary judgment "'may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)(quoting FED. R. CIV. P. 56(e)); *see also Miller v. Lorain Board of Elections*, 141 F.3d 252, 256 (6th Cir. 1998). Summary judgment is appropriate "where the record taken as a whole could not lead a rational trier of fact to find for the [non-moving party]." *Betkerur v. Aultman Hosp.*, 78 F.3d 1079, 1088 (6th Cir. 1996).

## III.  DISCUSSION

### A.  Background

In order to prevail on his § 1983 claim, Dudley must show that Officer Eden deprived him of a right secured by the Constitution or other federal laws. *See Foy v. City of Berea*, 58 F.3d 227, 229 (6th Cir. 1995). It is well established that Officer Eden's apprehension of Dudley by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). Accordingly, the pertinent question in this case is whether a rational jury could find that Officer Eden's use of deadly force was an *unreasonable* seizure in violation of the Fourth Amendment. Although the exact contours of the reasonableness inquiry are not capable of precise definition,

*see Bell v. Wolfish*, 441 U.S. 520, 559 (1979), Supreme Court and Sixth Circuit case law provide significant guidance.

In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court addressed the question of whether it is "objectively reasonable" for a police officer to use deadly force against an escaping suspect. The Court noted that as in other Fourth Amendment cases the reasonableness of the intrusion is assessed by "balancing the nature and the quality of the intrusion . . . against the importance of the of the governmental interests alleged to justify the intrusion" and determining "whether the totality of the circumstances justified . . . [the] seizure." *Id*. at 7-8. Applying this framework to the facts of the case, the Court concluded that it was not reasonable for a police officer responding to a nighttime burglary call to use deadly force against a fleeing subject who was young, slight of build, unarmed, and who posed no threat. *Id*. at 20- 21  However, the *Garner* Court also observed that in some situations it may be reasonable for police officers to use deadly force against fleeing suspects. In fact, the Court specifically noted that police officers may use deadly force to prevent a criminal suspect from escaping when they have probable cause to believe that a suspect poses a threat of serious physical harm to themselves or other members of the community. *Id*. at 11.

In *Graham v. Connor*, the Supreme Court re-emphasized *Garner's* holding that the Fourth Amendment reasonableness inquiry is based on the "totality of the circumstances" and urged "careful attention to the facts and circumstances of each particular case." 490 U.S. at 396. The Court also emphasized that the determination of reasonableness must be judged from the perspective of the reasonable officer at the scene, rather than the 20/20 vision of hindsight. *Id*. Justice Rehnquist's majority opinion explicitly held that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id*. at 396-7.

In addition, the Sixth Circuit Court of Appeals confronted the reasonableness of an officer's use of deadly force against a fleeing suspect in the case of *Smith v. Freland*, 954 F.2d 343 (1992). In that case, an unarmed motorist named Brent Smith ran a stop sign and led police officer Schulcz on a ninety mile per hour chase. When Schulcz finally cornered Smith in a dead-end street, Smith backed up his car and sped forward ramming the officer's cruiser. Smith then backed up again and zoomed around the police car. As Smith drove past, Officer Schulcz pulled his gun and fired one shot, which struck Smith and killed him. *Id.* at 344.

Smith's mother brought a § 1983 claim against Officer Schulcz and the City of Springdale, Ohio, which was dismissed on summary judgment. *Id*. at 344-45. After considering the Supreme Court's decisions in *Garner* and *Graham*, the Sixth Circuit held that summary judgment was appropriate since no rational jury could find that Officer Schulcz's actions were unreasonable. *Id*. at 346-47. This Court reasoned that even though Smith was unarmed and Schulcz may not have been in any immediate personal danger when he discharged his weapon, his actions were clearly reasonable given that these events happened very quickly and Smith's continued escape would have posed a significant threat of injury to numerous others. *Id*.

## B.    Analysis

On appeal, Dudley argues that the district court erred in granting summary judgment because a jury could find that Officer Eden acted unreasonably. Although Dudley acknowledges Supreme Court and Sixth Circuit case law holding that a police officer may use deadly force to apprehend a fleeing suspect who poses a threat to the police or other citizens, he contends that Officer Eden's use of deadly force against him was unreasonable because he did not pose such a threat.

Specifically, Dudley argues that unlike Smith, who led the police on a high speed chase, evaded police roadblocks, and rammed a police officer's cruiser in an attempt to escape, he