NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0641n.06
Filed: August 30, 2007

Case No. 06-3583

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

HARRIET GREEN,

     Plaintiff-Appellee,

v.

ROBERT TAYLOR,

     Defendant-Appellant.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

_____

Before: SILER and COOK, Circuit Judges; and REEVES, District Judge.[*]

DANNY C. REEVES, District Judge.  Robert Taylor appeals the district court's order denying his motion for summary judgment based on qualified immunity.  The district court found that several disputed issues of fact precluded dismissal of the claims against Taylor based on qualified immunity.  We agree with the district court's analysis and AFFIRM its decision.

**BACKGROUND**

Harriet Green brought this action pursuant to 42 U.S.C. § 1983, individually, and as administratrix of the estate of Ricardo Mason.  Mason, age sixteen, was shot and killed during a police pursuit on August 27, 2002. In her amended complaint, Green names a number of defendants,

_____

[*]    The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

-1-

including the City of Cleveland, Officer Robert Taylor, Officer Matthew Baeppler, and several other officers. However, this interlocutory appeal only concerns the district court's denial of summary judgment as to Taylor on the grounds of qualified immunity.

## I.        The Pursuit and Shooting

At approximately 1:14 a.m. on August 27, 2002, Officer Scott Clayton observed a vehicle make a "quick turn" onto West 85th Street, in Cleveland, Ohio. After broadcasting the license number to dispatch, Clayton was advised that the vehicle, a 1994 Pontiac Grand Prix, was an "entered" vehicle, that is, it was stolen or otherwise suspected to be involved with a crime. And after observing another patrol car, Unit 113, approaching from the opposite direction on West 85th Street, Clayton activated his lights and sirens and attempted to stop the suspect. This was accomplished by Unit 113 pulling in front of the Pontiac at an angle, with Baeppler driving and Taylor in the passenger seat.

The parties dispute what happened next. The officers claim that as Taylor and Baeppler began to exit their vehicle, the driver of the Pontiac squealed his tires and made a hard turn around Unit 113, almost striking Taylor. Conversely, the driver of the Pontiac, Malcolm Hoyle, claims that he did not attempt to hit the patrol car or the officer and that he went "way around" the vehicle and through an alley to 83rd Street.

Hoyle was accompanied by two passengers in the Pontiac: Mason in the front passenger seat, and Adam Michael in the backseat. Following the incident on 85th Street, Hoyle committed several traffic violations in an attempt to evade the police. Eventually, Taylor and Baeppler took over the pursuit while Clayton paralleled their path on a different street.

The chase continued for less than three minutes until Hoyle made an abrupt turn into a vacant lot. Hoyle testified that he saw another police car approaching from the opposite direction and turned into the vacant lot to avoid a head-on collision. When the Pontiac entered the vacant lot, Taylor announced over the radio that the suspects were "bailing." According to Taylor, he made this announcement because he believed that the lot was a dead-end and that the suspects would leave the car and run, based on his past experiences. Hoyle drove the Pontiac through the vacant lot and attempted a left turn. However, Hoyle failed to negotiate the turn and crashed into a fence.[1]

It is undisputed that the Pontiac came to a stop after the crash, although the engine was still running. Baeppler immediately pulled-up behind the suspect vehicle with his patrol car at a forty-five degree angle approximately six to twelve inches from the Pontiac's rear bumper. With their guns drawn, Baeppler approached the driver side of the Pontiac while Taylor approached the passenger side.

Again, the parties dispute what happened as the officers approached the suspect vehicle. Baeppler claims that he reached the driver side door and instructed the occupants to show their hands, but they failed to comply. Taylor claims that the passenger side of the vehicle was blocked by a fence and shrubbery and that he was forced to stand behind the vehicle on the right side to safely cover his partner. He further claims that the engine was revving and that he became pinned between the vehicle, the fence, and the patrol car. Taylor claims that he yelled to Baeppler "I'm trapped."

According to Baeppler, he heard Taylor's plea as the car "lurched backward." Baeppler fired a single shot at the driver, hitting him in the face. Taylor also claims that the vehicle lurched backwards, striking him in the left leg and causing him to lose his balance and stumble backward.

---

[1] Hoyle claims that the police car bumped the Pontiac, causing it to crash into the fence.

Taylor asserts that, as he was being struck by the vehicle, he fired his weapon (purportedly aiming at the driver). He also asserts that he did not hear Baeppler fire his weapon first. Taylor fired two shots, both of which struck Mason (the front seat passenger) in the back. Taylor eventually went to the hospital and was treated for a contusion and abrasion on his left knee.

Green's version of the shooting differs significantly from that of the officers. Green claims that the suspects showed their hands as instructed, that the vehicle did not lurch backwards, that Taylor was actually standing on the passenger side of the vehicle rather than behind it, and that multiple officers attempted to manipulate the scene to fit Taylor's version of events. In support, Green relies upon the deposition testimony of Hoyle and Michael, the Internal Affairs investigation report, and the affidavit of an eye-witness, Daniel Sears.

At his deposition, Hoyle testified that he could not exit the Pontiac after it hit the fence because the doors were locked. According to Hoyle, the police were by the back window cussing at them, so he told the passengers to raise their hands. Hoyle asserts that although he and the other passengers raised their hands, the officer shot him without provocation. Hoyle further testified that he did not put the car in reverse, but the engine was still running.[2] In his affidavit, Hoyle claims that the front of the car was against a fence and that a police car was very close behind it.

The backseat passenger, Michael, also testified that he raised his hands and that the car never backed up after striking the fence.[3] According to Michael, the officers instructed Hoyle to put his

---

[2] Although Hoyle maintains that he did not put the car in reverse, a police report indicates that Hoyle previously stated that "he did not know he had hit the police officer and only heard a loud pow while backing up the car."

[3] Michael's statement is contrary to a prior written statement allegedly given to police officers at the scene of the incident. At that time, Michael stated that,

hands on the steering wheel, and Hoyle complied. Michael further contends that he witnessed the officers move the Pontiac backward after the shooting but prior to taking crime scene photographs to "cover up" the officer's use of excessive force.[4]

Daniel Sears claims to have witnessed the shooting from the vacant lot. Sears asserts that one officer was standing by the driver side window and that the other officer fell on one knee as he went into the alley. According to Sears, the officer at the driver side window opened fire when the other officer fell, and the passenger of the suspect vehicle turned to hold the driver. Sears claims that he heard someone yell "don't shoot" before the officer who had fallen fired his weapon. Sears states that the officer who had fallen was standing on the passenger side of the vehicle and that the vehicle did not appear to be running and did not move backward. Sears further claims that he saw two officers move the vehicle away from the pole and scratch the front of the patrol car with a chisel. Finally, Sears claims that a sergeant yelled at the officers for moving the car.

---

> [w]e hit the fence and tried to back up. That's when the cop came out and said "Stop. Let me see your hands." I felt the car moving backwards at not even 5 miles per hour. That's when I heard the gun shot. The car stopped.

The district court noted that Michael stated in his deposition that "he signed the police statement without reading it because he was tired of the police and tired of being at the police station." However, the cited portion of Michael's deposition is not contained in the record on appeal.

[4] The spoliation of evidence claim is not before this Court. However, the district court determined that a genuine issue of material fact existed regarding whether the Pontiac was moved after the shooting. The district court concluded that,

> [t]he parties agree that the physical evidence shows the Pontiac moved to the left at some time between the crash and the police photographs. The parties, and their experts and witnesses, disagree as to when the movement occurred. . . . The court is unaware of any physical evidence that conclusively establishes *when* the Pontiac moved or *who* moved it. Thus, these are fact questions for the jury.

(District Ct. Op. 37-38)

The Internal Affairs investigation report and a City of Cleveland internal report also indicate that Taylor was standing on the passenger side of the vehicle. The Internal Affairs report notes that one of Taylor's bullets passed through the passenger side window, and the City of Cleveland report expressly concludes that Taylor was standing on the passenger side of the vehicle. It states that "Officer Taylor attempted to gain access to the suspect's vehicle by entering the passenger's side of the vehicle, but became pinned between the passenger side of the vehicle and some bushes."

Taylor admits that the patrol car (Unit 113) was moved prior to processing the crime scene because another officer mistakenly believed that the patrol car needed to be moved to allow EMS access to the suspects. However, he contends that the Pontiac was not moved and that any tire tracks were the result of the vehicle reversing into him. Both parties have submitted expert reports which support their respective positions concerning the movement of the Pontiac.

Ultimately, it is undisputed that Baeppler fired one shot through the driver side window, wounding Hoyle. It is also undisputed that Taylor fired two shots, one passing through the rear window, and one passing through the passenger side window, both of which struck Mason in the back, resulting in his death. The police radio log states that an officer first reported a shot fired at 1:18:47, and multiple shots fired at 1:18:51. Thus, the police log indicates that the first shot was fired eleven seconds after Taylor reported that the suspects were "bailing" at 1:18:36. The entire pursuit including the stop and shooting lasted less than four minutes. Hoyle was criminally charged with Mason's death and pled guilty to involuntary manslaughter in the commission of a misdemeanor.

**II.    Procedural History**

-6-

Green filed the current action against the City of Cleveland and over a dozen of its officers, including ten John Doe defendants. In her amended complaint, she alleges two claims under § 1983, a *Monell* claim against the City of Cleveland for failure to train and investigate, assault and battery, spoliation of evidence, intentional infliction of emotional distress, and conspiracy. The district court granted summary judgment in favor of all remaining defendants except Taylor and Baeppler.[5] The court concluded that Baeppler was entitled to qualified immunity, but that a genuine issue of material fact existed regarding the spoliation claim. The court further determined that Taylor was not entitled to qualified immunity because at least two genuine issues of material fact existed regarding whether the Pontiac reversed and where Taylor was standing at the time of the shooting.

Taylor filed a timely notice of appeal on April 26, 2006. Thereafter, Green filed a motion to dismiss the interlocutory appeal for lack of jurisdiction. In support, Green contends that Taylor has not presented a discrete issue of law and has failed to concede the facts in the light most favorable to her.

## JURISDICTION

The denial of a motion for summary judgment on the grounds of qualified immunity is immediately appealable under 28 U.S.C. § 1291, but only to the extent that it raises discrete questions of law. *Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005) *(quoting Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). "A defendant raising a qualified immunity defense 'may not appeal a district court's summary judgment order insofar as that order determines whether or not the

---

[5] The parties stipulated to the dismissal of two officers, and the district court denied as untimely Green's motion to amend her complaint to name the ten John Doe defendants. Accordingly, the only defendants remaining in the action at the time of district court's ruling were the City of Cleveland and officers Taylor, Baeppler and Neagu.

pretrial record sets forth a genuine issue of fact for trial.'" *Livermore v. Lubelan*, 476 F.3d 397, 402 (6th Cir. 2007) (*quoting Johnson v. Jones*, 515 U.S. 304, 319-20 (1995)). Additionally, "[b]ecause this court does not have appellate jurisdiction over factual issues, a defendant must 'concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Carter*, 408 F.3d at 309 (*quoting Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998)).

Where a defendant's arguments regarding qualified immunity "rely exclusively on a disputed version of the facts, this court does not have jurisdiction to consider their appeal." *McKenna v. City of Royal Oak*, 469 F.3d 559, 560 (6th Cir. 2006). "If, however, aside from the impermissible arguments regarding disputes of fact, the defendant also raises 'the purely legal question of whether the facts alleged support a claim of violation of clearly established law,' then there is an issue over which this court has jurisdiction." *Carter*, 408 F.3d at 310 (*quoting Berryman*, 150 F.3d at 562)).

In *Carter*, this Court held that jurisdiction was proper over an appeal of the denial of qualified immunity even though the defendant failed to concede the facts in the light most favorable to the plaintiff. *Id.* The Court noted that the appellant claimed that he presented a purely legal issue, but he "nonetheless spen[t] much of the following twenty pages of his brief arguing that the district court 'erroneously considered inadmissible evidence' and 'improperly found genuine issues of material fact.'" *Id.* The Court held that these arguments were "impermissible," but that it could "ignore the defendant's attempts to dispute the facts" and "resolve the legal issue." *Id.*; *see also Livermore*, 476 F.3d at 403 (noting that "we may consider a pure question of law, despite the defendants' failure to concede the plaintiff's version of facts for purposes of the interlocutory appeal").

In the present case, the district court determined that disputed issues of fact existed concerning whether the Pontiac was backing up and where Taylor was standing at the time of the shooting. The court further determined that these facts were material to whether Taylor's actions were reasonable under the circumstances. The district court concluded that,

> in the instant case, if the Pontiac reversed, it posed a threat to Taylor. However, construing the facts in Plaintiff's favor, the Pontiac was up against the fence pole, the police vehicle was six to twelve inches behind it, the Pontiac was not moving, and the occupants of the car had their hands in the air or on the steering wheel. Under these circumstances, there was no immediate danger to Taylor or Baeppler or anyone else, no indication the passengers or the vehicle were trying to escape, and no reasonable justification for firing weapons.
> . . .
> If Taylor was standing next to the Pontiac instead of behind it, his life was not threatened even if the Pontiac did back up, and his use of deadly force was thus unreasonable.

(District Ct. Op. 21-22).

In his briefs, Taylor refuses to concede the facts in the light most favorable to Green. Instead, he repeatedly argues that the Pontiac was backing up, that the vehicle had already become a deadly weapon, that the suspects were non-compliant, and that the evidence relied on by the district court in finding that disputed issues of material fact exist is not competent. This Court does not have jurisdiction over these disputed factual issues. *See McKenna*, 469 F.3d at 561-62; *Carter* 408 F.3d at 310. However, the Court does have jurisdiction over the "purely legal question" of whether the facts alleged by Green "support a claim of violation of clearly established law." *See Berryman*, 150 F.3d at 562. As in *Carter*, "this court can ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *Carter*, 408 F.3d at 310.

## DISCUSSION

This Court reviews the district court's denial of summary judgment on the grounds of qualified immunity de novo. *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005) (*quoting Yates v. City of Cleveland*, 941 F.2d 444, 446 (6th Cir. 1991)). The burden is on the plaintiff is to show that the defendant is not entitled to qualified immunity. *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006). In the context of excessive force, "it is not enough that a plaintiff establishes that the defendant's use of force was excessive under the Fourth Amendment. To defeat qualified immunity, the plaintiff must show that the defendant had notice that the manner in which the force was used had been previously proscribed." *Livermore*, 476 F.3d at 404.

The Supreme Court has developed a two-part test to determine whether a defendant is entitled to qualified immunity under the circumstances of a case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, a court must determine if the facts taken in the light most favorable to the injured party show that the officer's conduct violated a constitutional right. *Id*. Then, if the court finds that such a violation has occurred, it must determine if the right was "clearly established." *Id*.

## I. Constitutional Violation

In *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), the Supreme Court held that "the Fourth Amendment prohibits a police officer's use of deadly force to seize an unarmed, non-dangerous suspect." *Sample*, 409 F.3d at 696 (*citing Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). The use of deadly force is only reasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11; *see also Sample*, 409 F.3d at 699 (*quoting Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)) ("[A] criminal suspect 'has a right not to be shot unless he is perceived to pose a threat to the pursuing officers or to others during flight.'").

This Court has repeatedly noted that, "only in rare instance may an officer seize a suspect by use of deadly force." *Livermore*, 476 F.3d at 404. There are three factors that courts should consider in determining whether an officer's actions were reasonable under the Fourth Amendment: "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Id*. (*citing Graham v. Connor*, 490 U.S. 386, 396 (1989); *Smoak*, 460 F.3d at 783 (6th Cir. 2006)). However, "[t]hese factors are not an exhaustive list, as the ultimate inquiry is 'whether the totality of circumstances justifies a particular sort of seizure." *Id*. (*quoting St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)).

In the present case, Taylor's use of deadly force was not reasonable under the facts alleged by Green. If the vehicle came to a complete stop, with the engine running, and if the suspects put their hands in the air or on the steering wheel as the officers approached the vehicle, Taylor did not have probable cause to believe that the suspects "posed a threat of serious physical harm, either to the officer or to others." *See Garner*, 471 U.S. at 11.

The factors enunciated by the Court in *Livermore* and *Garner* also weigh against Taylor's use of deadly force under the circumstances presented. According to the officers' testimony, the only crimes at issue were that the suspects were driving an "entered" vehicle, that is, a vehicle that is wanted in connection with a crime, as well as several traffic violations including speeding and running approximately three red lights. Despite Taylor's repeated arguments to the contrary, Green has presented evidence that the driver of the Pontiac did not attempt to hit Taylor on West 85th Street and the officers did not have reason to believe that the suspects had committed any felony offenses.

-11-

The second factor also weighs against Taylor's use of deadly force. In *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005), this Court held that an officer is not justified in using deadly force when there is no immediate risk of serious danger to him or anyone else. *Smith v. Cupp*, 430 F.3d 766, 776 (6th Cir. 2005). If the vehicle was not backing up and the suspects were attempting to surrender, there was no *immediate* threat to the officers or others. Taylor conceded at his deposition that "[i]f the vehicle wasn't being used as a weapon I would have had no reason to fire."

Finally, although the suspects had previously attempted to evade the police in the chase, a reasonable jury could conclude that the chase ended when the Pontiac struck the fence and the patrol car blocked further routes of escape. After the vehicle struck the fence, Officers Taylor and Baeppler had sufficient time to exit their vehicle, draw their weapons, and position themselves around the vehicle before any shots were fired. Both officers testified that the vehicle came to a complete stop after hitting the fence. It is also undisputed that Baeppler attempted to open the driver side door, pounded on the driver side window, and observed the suspects in the vehicle prior to the shooting. If the vehicle did not move backward and the suspects complied with the officers' orders, Taylor had no reasonable basis for believing that the suspects would attempt to flee or resist arrest.[6]

---

[6]     Taylor relies on the Eleventh Circuit's decision in *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002), for the proposition that he was justified in shooting even if the vehicle was not moving and the chase had ended. However, the facts in *Pace* are distinguishable. There, the Eleventh Circuit determined there was no evidence to support the allegation that the suspect was surrendering. Further, there was probable cause for the officer to believe that the suspect vehicle was a dangerous weapon and that the driver had committed numerous felonies. *Pace*, 283 F.3d at 1282. Here, Taylor did not have probable cause to believe that the vehicle had become a deadly weapon. Although Taylor repeatedly argues this disputed fact, Green presented evidence that Hoyle did not attempt to hit the officer or the patrol vehicle on West 85th Street. Hoyle testified at his deposition that he went "way around" the police car and down an alley to 83rd Street. Second, the officers only had probable cause to believe that Hoyle had committed a misdemeanor, not a felony. Further, the suspects did comply with the officers' orders to show their hands. Hoyle and Michael testified that they had their hands in the air or on the steering wheel and that the car did not move backward at any point after crashing into the pole.

In *Smith v. Cupp*, 430 F.3d at 775 (6th Cir. 2005), this Court held that an officer's use of deadly force against a fleeing suspect was not justified where the officer did not have reason to believe that the vehicle presented an "imminent danger." In *Smith*, the suspect was arrested and placed in the back seat of a police cruiser. The arresting officer left the vehicle running to provide air conditioning while he was attempting to have the suspect's vehicle towed. The suspect climbed into the front seat, put the car in gear, and rapidly accelerated towards the officer and the tow truck driver. The officer drew his gun and fired four shots at the driver as he drove past, allegedly barely missing the officer.

This Court held that the officer in *Smith* violated the suspect's constitutional right because a reasonable jury could conclude that the officer was not in any danger. "The fact that this was a rapidly evolving situation does not, by itself, permit him to use deadly force." *Id*. This Court concluded that,

> [t]hough Smith could have used the police cruiser to injure or kill Officer Dunn, under the plaintiffs' version of the facts he was not doing so when Dunn shot him or even before Dunn shot him. Although Smith had possession of a dangerous "weapon," he was not threatening the lives of those around him with it when he was fatally shot. This type of situation does not present "a perceived serious threat of physical harm to the officer or others in the area from the perspective of a reasonable officer." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005). A jury would therefore be entitled to determine that Officer Dunn's use of force was unreasonable and accordingly unconstitutional.

*Id*.

As in *Smith*, a reasonable jury could conclude that Officer Taylor was not in any danger when he fired his weapon at the Pontiac. Taylor's reliance on the fact that only eleven seconds passed between the time he announced that the suspects were bailing and shots were fired is insufficient to establish that Taylor was justified in using deadly force. Accordingly, under the specific

-13-

circumstances of this case, where disputed testimony and evidence has been presented from which a jury could reasonably conclude that the suspect vehicle came to a complete stop, with the engine running, and the suspects attempted to surrender to the officers, Taylor violated Mason's constitutional right not to be shot.

## II. Clearly Established Right

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The Supreme Court has repeatedly emphasized that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004) (*quoting Saucier*, 533 U.S. at 201). Further, "[b]ecause the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id*.

In the present case, the Court must analyze the law as of August 27, 2002, to determine whether a reasonable officer would have known that the use of deadly force under the circumstances presented was not justified. As early as 1985, the Supreme Court held that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11. Moreover, it was clearly established law at the time of the underlying events that suspects have a right not to be shot unless they are perceived to pose a threat to officers or others. *See id*.; *Yates*, 941 F.2d at 447 (citations omitted) ("At the time of the shooting it was clearly established in the Sixth Circuit that Yates 'had a right not to be shot unless he was perceived to pose a threat to the pursuing officers or to others.'"); *Robinson*, 840 F.2d at 351.

-14-

The present situation is an "obvious case" in which the standards articulated in *Garner* and *Yates* "'clearly establish' the answer, even without a body of relevant case law." *See Brousseu*, 543 U.S. at 199. The district court correctly determined that a reasonable jury could conclude under Green's version of the facts that Taylor had no reason to believe that the suspects posed an immediate risk to the officers or anyone else if the vehicle was not backing up or being used as a weapon.

In his brief, Taylor relies upon the holding in *Brousseau* to argue that the present case is not an obvious case and that Green has failed to present a "clearly established" body of case law to show that Taylor's actions were unreasonable. This Court's decision in *Smith v. Cupp* is highly instructive on this point. Although *Smith* was decided after the underlying events in the present case, it applied the law that was established as of April, 2002. In *Smith*, this Court held that,

> [t]he absence of any *Garner* preconditions to the use of deadly force makes this an "obvious" case and distinguishes it from *Brosseau*. In *Brosseau*, the Supreme Court reversed the denial of qualified immunity to an officer sued for Fourth Amendment violations under § 1983 for shooting a suspected felon as he attempted to flee in a vehicle, where the officer had arguable probable cause to believe that the suspect posed an imminent threat of serious physical harm to several officers and citizens in the immediate surrounding area. Unlike Smith, Haugen was a suspected felon with a no-bail warrant out for his arrest, with whom Brosseau had experienced a violent physical encounter prior to the shooting. Believing that Haugen had entered the Jeep to retrieve a gun, Brosseau broke the windowpane of the Jeep, and attempted to stop Haugen by hitting him over the head with the butt and barrel of her gun. Haugen was undeterred, however, and began to take off out of the driveway, without regard for the safety of those in his immediate vicinity – the three officers on foot, a woman and her 3-year-old child in a small vehicle four feet away, and two men in a parked vehicle 20 to 30 feet away.

> The facts in *Brosseau* are not comparable to those in this case. In the light most favorable to Smith, there is no comparable evidence that Dunn had cause to believe that Smith posed an immediate risk of death or serious danger to Dunn, Rutherford, or nearby citizens. Smith was being arrested for a making harassing phone calls, not a crime involving the infliction or threatened infliction of serious physical harm.

> *Graham*, 490 U.S. at 396. Unlike the situation in *Brosseau*, Smith and Dunn never struggled, Smith never displayed any violent tendencies, and the facts support a finding that a reasonable officer in Dunn's position would not have perceived danger to anyone at the scene. The fact that this case is very different from *Brosseau* permits the conclusion that *Garner*, by itself, clearly establishes the right at issue.

*Smith*, 430 F.3d at 776.

As in *Smith*, the situation presented here is very different from *Brousseau* and permits a finding that *Garner* "clearly establishes" the right at issue; that is, the right not to be shot unless the suspect poses an immediate threat to the officers or others. *Garner*, 471 U.S. at 11. As discussed previously, the Eleventh Circuit's decision in *Pace* is also not dispositive of the case currently before the Court.[7]

_____

[7] The district court correctly determined that the other cases cited by Taylor, including *Scott v. Clay County*, 205 F.3d 867 (6th Cir. 2000), *Dudley v. Eden*, 260 F.3d 722 (6th Cir. 2001), and *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992), are inapposite to the situation currently before the Court. For example, in *Scott v. Clay County*, this Court repeatedly emphasized that the officers did not know that there were passengers in the vehicle and that the driver committed numerous felonies in the course of the pursuit which reached speeds of 85 to 100 m.p.h. *Scott*, 205 F.3d at 877-78. There was no dispute that the driver had committed "serious life-threatening crimes in the presence of the defendant officers" or that "the fleeing motorist's ongoing felonious misconduct posed an immediate threat to the safety of officers as well as innocent civilians." *Id*. at 877. Based on these undisputed facts, the Court found that the officers were entitled to summary judgment on the grounds of qualified immunity.

Similarly, in *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992), the pursuit involved speeds reaching 90 m.p.h. in residential areas and the suspect actually crashed into a police vehicle head-on in an attempt to escape. It was undisputed that the suspect attempted to hit the officers on two other occasions, and the pursuing officer had reason to believe that the suspect had committed the felony of assault on a police officer. *Smith*, 954 F.2d at 344. After a short chase, the suspect pulled into a dead end street, turned his vehicle around in a lawn, then sped forward and crashed into the officer's vehicle. As the vehicle drove past, the officer fired one shot, killing the driver. Although the Court found that the officer was no longer in imminent danger at the time he fired his weapon, the Court held that it was reasonable for him to believe that the suspect posed a danger of serious harm to others. *Id*. at 348.

Finally, in *Dudley v. Eden*, the suspect robbed a bank and waited for the officers in a parking lot with the intent "to commit suicide by way of police intervention." *Dudley*, 260 F.3d at 723. It was undisputed that the driver rammed a police vehicle, and the Court concluded that, "[g]iven Dudley's bank robbery, his refusal to comply with the commands of armed policemen, his attempt to evade arrest, and his reckless driving, it was reasonable for Officer Eden to conclude that Dudley posed a serious threat to himself and others." *Id*. at 727.

-16-

Because Taylor had no reason to believe that he was in imminent danger under Green's version of the facts, as the vehicle was stopped and the suspects were attempting to surrender in compliance with Baeppler's orders, this is a case of a violation of a clearly established right under *Garner* and *Yates*. *See Smith*, 430 F.3d at 776. The district court correctly determined that these disputed issues of fact are material regarding whether Taylor's actions were reasonable.

## CONCLUSION

We AFFIRM the district court's order.